UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ELIZABETH R. PADDOCK,<br><br>    Plaintiff,<br><br>v.<br><br>PEACEHEALTH, INC. d/b/a ST. JOSEPH'S MEDICAL CENTER and PEACEHEALTH MEDICAL GROUP, et al.,<br><br>    Defendants. | CASE NO. 2:21-cv-00639-JHC<br><br>ORDER CERTIFYING QUESTION TO WASHINGTON STATE SUPREME COURT |

   This case presents a novel and significant question of Washington tort law in the medical malpractice context.  Plaintiff, Elizabeth Paddock, moves for partial summary judgment dismissal of two affirmative defenses—contributory negligence and RCW 5.40.060 (Intoxication)—asserted by Defendants Dr. David E. Baker, M.D., Fourth Corner Neurosurgical Associates, and Peacehealth, Inc. d/b/a St. Joseph's Medical Center and Peacehealth Medical Group.  Dkt. # 108; *see* Dkt. # 66 at 33 ¶¶ 13, 22; Dkt. # 95 at 15 ¶¶ 4, 6.  The motion raises the issue of whether, in a medical malpractice suit, a court may consider a plaintiff's "pretreatment conduct" as a basis for such affirmative defenses.  The Court agrees with the parties that it is appropriate to certify this question to the Washington State Supreme Court.  *See* Dkt. # 124 at 2, 13; Dkt. # 117 at 20–21.

## II
### BACKGROUND

On the morning of August 2, 2020, after consuming alcohol and mind-altering drugs, Paddock drove her vehicle at a high speed and crashed into a telephone pole. *See* Dkt. # 102-5 at 3–8. She sustained serious injuries and paramedics transported her to Peacehealth St. Joseph's Medical Center (Peacehealth) where trauma surgeon, Dr. Paul B. Fredette, met her at the trauma bay. Dkt. # 109-1 at 3. Dr. Fredette placed Paddock in a hard collar and performed a physical examination, noting that she did not present with any obvious neurological deficits and could move her extremities normally. *Id.* at 216–17, 223–25, 230–31. Dr. Fredette also noted—and Paddock disclosed—that she had consumed drugs and alcohol before her collision. *See id.* at 186–87, 219.

After intake, doctors took a CT scan of Paddock's neck. A radiologist interpreted this CT scan, observing the neck as having a minimally displaced type II dens fracture, which was not compressing Paddock's spinal cord. *Id.* at 242–44. Dr. Fredette shared Paddock's cervical CT scan with neurosurgeon Dr. David Baker, and Dr. Baker also interpreted it as showing a minimally displaced type II odontoid fracture with no angulation, normal alignment, and no compromise of the spinal canal. *Id.* at 226–27, 248–51 .

Paddock also had a complex left eyebrow laceration and Dr. Fredette and a plastic surgeon decided to perform surgery to repair it. *Id.* at 231–33. Anesthesiologist Dr. John Morrison prepared Paddock for surgery and observed that she could move her arms and legs without difficulty; he intubated and extubated Paddock for this procedure. *See* Dkt. # 102-4 at 3–5; Dkt. # 109-1 at 201, 266–74.

After surgery, Paddock was transferred to the ICU where Dr. Baker examined her and performed a neurological examination. Dkt. # 109-1 at 257. Dr. Baker noted that Paddock could

move all four extremities against gravity to some extent and that she had no sensory abnormalities. *Id.* at 257–60. Dr. Baker again reviewed the CT imaging and reiterated that he believed that Paddock had a Type II odontoid fracture that was not compromising the spinal canal. *Id.* at 261–62.

Following this visit, Dr. Baker kept Paddock in the hard collar and planned to place her in a halo vest on the following afternoon, expressing concern that placement in a halo vest at this stage could present risks such as aspiration or hemorrhaging. Dkt. #102-3 at 3; Dkt. # 109-1 at 261–62. That evening, two registered nurses cared for Paddock, noting that she could move her extremities at the beginning of their shift. *See, e.g.*, Dkt. # 109-1 at 283–87. At around 11:10 p.m., Paddock began to feel nauseated, dry heave, and complained that she could not breath well. *Id.* at 287–88, 297–99. A nurse gave Paddock medication for the pain and repositioned her. *Id.* at 299–301. Soon after, Paddock's chest stopped rising and she became unresponsive. *Id.* at 302–04. A STAT chest x-ray was taken and on-call trauma surgeon, Dr. Camile Miller, was called. *Id.* at 189, 305. Dr. Miller intubated Paddock around midnight and ordered another CT scan of her neck. *Id.* at 305, 320–23. Upon review of this new CT scan, Dr. Miller saw that Paddock's neck fracture was now displaced towards her face and was compressing her spinal cord. *Id.* at 189–90, 322–23, 325. The interpreting radiologist also noted that the second CT scan showed an anterior displacement of Paddock's neck fracture. *Id.* at 206–07. At some point later that night, Dr. Miller spoke with Paddock and asked her to move her arms and legs; Paddock could not. *Id.* at 324–27, 331–32. Paddock was then transferred to Harborview and ultimately diagnosed with quadriplegia because of a C1 spinal cord injury. *See id.* at 308–09, 330.

# III
## Discussion

In her motion for partial summary judgment, Paddock says that it is undisputed that she was not quadriplegic upon arrival at the hospital and that her spinal cord was not compressed when she presented at the trauma bay just after her collision. Dkt. # 108 at 2. Paddock also states that it is undisputed that she "subsequently sustained a spinal cord injury while admitted to the [Peacehealth] hospital, and that [her] spinal cord injury occurred when her neck fracture dislocated and compressed her spinal cord at the hospital." *Id.* Paddock clarifies that she "is not seeking any damages for the injuries she sustained in the preceding motor vehicle accident – including her neck fracture. Instead, [she] is only seeking damages for her spinal cord injury." *Id.* at 27. Paddock contends that because her conduct preceding the collision may not be used for Defendants' affirmative defenses of contributory negligence and RCW 5.40.060, the Court should dismiss the defenses as a matter of law. *Id.* at 2–3.

Both parties agree that Washington case law does not address whether a plaintiff's pretreatment negligence may serve as a comparative fault defense in a medical malpractice action. *Id.* at 2 ("Washington Appellate Courts have not considered the validity of a contributory negligence defense when a plaintiff incurs a new injury while receiving medical treatment necessitated by a pretreatment contributory negligence."); *see* Dkt. # 117 at 13 n.3.

Paddock contends that the Court should apply the "majority rule" in other jurisdictions: "that a plaintiff's pretreatment negligence that necessitates their seeking medical care does not form the basis of a contributory negligence defense in a medical malpractice claim when the

plaintiff is only seeking damages for a *new* injury caused by the alleged medical negligence." Dkt. # 108 at 2, 12–16.[1]

Peacehealth opposes the motion, stating that Washington law establishes "that the existence of *any* contributory fault resulting in proximate cause for the claimed injuries diminishes a defendant's proportionate share of damages." Dkt. # 117 at 3 (citing RCW 4.22.005). According to Peacehealth, Washington's pure comparative fault framework does not include an exception for medical malpractice and therefore the Court should not consider any out-of-jurisdiction cases proffered by Paddock. *Id.* at 11–18. Peacehealth also asserts that "public policy supports the application of comparative fault for pretreatment negligence in medical negligence claims." *Id.* at 3, 18–20. For these reasons, Peacehealth contends that it may assert the affirmative defenses of contributory negligence and RCW 5.40.060 (Intoxication).

Because the parties agree that certification is appropriate, *see* Dkt. # 124 at 2, 13; Dkt. # 117 at 20–21, this issue of Washington law "has not been clearly determined," *see* RCW 2.60.020, and its resolution will have far-reaching effects on individuals subject to Washington law, *see Queen Anne Park Homeowners Ass'n v. State Farm Fire & Cas. Co.*, 763 F.3d 1235,

---

[1] Paddock cites cases from Oregon, California, Oklahoma, Montana, Nebraska, Georgia, Tennessee, West Virginia, Florida, and Texas. *See Son v. Ashland Cmty. Healthcare Servs.*, 239 Or. App. 495, 509, 244 P.3d 835 (2010) ("[A] valid defense of comparative fault in medical malpractice cases requires that the plaintiff's negligent conduct relate and contribute to the negligent treatment, because it is the negligent treatment that causes the injury that is at issue. Stated another way, the patient's negligence must have been an element in the transaction on which the malpractice is based."); *Harb v. City of Bakersfield*, 233 Cal. App. 4th 606, 633, 183 Cal. Rptr. 3d 59 (2015) ("[T]he issue of a plaintiff's comparative fault should not be presented to the jury when the plaintiff's allegedly negligent conduct occurred before the first responders arrived at the scene of the accident."); *Fritts v. McKinne*, 934 P. 2d 371 (Okla. Civ. App. 1996); *Harding v. Deiss*, 300 Mont. 312, 318, 3 P.3d 1286 (2000); *Jensen v. Archbishop Bergan Mercy Hosp.*, 236 Neb. 1, 15, 459 N.W. 2d 178 (1990); *Martin v. Reed*, 200 Ga. App. 775, 777, 409 S.E. 2d 874 (1991); *Mercer v. Vanderbilt Univ., Inc.*, 134 S.W. 3d 121 (Tenn. 2004); *Rowe v. Sisters of Pallottine Missionary Soc'y*, 211 W. Va. 16, 22, 560 S.E. 2d 491 (2001); *Matthews v. Williford*, 318 So. 2d 480, 483 (Fla. Dist. Ct. App. 1975); *Sendejar v. Alice Physicians & Surgeons Hosp., Inc.*, 555 S.W. 2d 879, 885 (Tex. Civ. App. 1977).

1235 (9th Cir. 2014), the Court respectfully CERTIFIES the following question to the Washington Supreme Court:

> Under Washington law, in a medical malpractice suit, may a court consider a plaintiff's "pretreatment conduct" as a basis of a defendant's affirmative defenses?

The Court does not intend its framing of this question to restrict the Washington Supreme Court's consideration of any issues. Should the Washington Supreme Court accept certification, to be sure, it may reformulate the question. *See Affiliated FM Ins. Co. v. LTK Consulting Servs. Inc.*, 556 F. 3d 920, 922 (9th Cir. 2009).

The Court DIRECTS the Clerk to submit to the Washington Supreme Court electronic and certified copies of this order, a copy of the docket in the above-captioned matter, and all materials at docket numbers 78, 95, 98, 108, 109, 117, 118, and 124. The Court certifies that these documents contain all matters in the pending case deemed material for consideration of the question of local law certified for answer. *See* RCW 2.60.010(4)(b). The Court designates Plaintiff as the party to file the first brief in the Washington Supreme Court on the certified question. *See* Wash. R. App. P. 16.16(e)(1). The parties are referred to Washington Rule of Appellate Procedure 16.16 for more information about procedures on review of the certified question.

The Court STAYS this action pending the Washington Supreme Court's decision on the proposed certified question and STRIKES the trial date and all pending motions *except* for Peacehealth's motion for summary judgment (Dkt. # 101). The parties shall file a joint status report no later than fourteen (14) days after the Washington Supreme Court issues a final decision.

/

/

ORDER CERTIFYING QUESTION TO
WASHINGTON STATE SUPREME COURT - 6

Dated this 18th day of January, 2024.

John H. Chun
United States District Judge